## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| **JANE DOE** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **MANOR COLLEGE** | ) | **JURY TRIAL DEMANDED** |
| 700 Fox Chase Road | ) | |
| Jenkintown, PA 19046 | ) | |
| | ) | |
| Defendant. | ) | |

_____

## COMPLAINT

**COMES NOW** Plaintiff Jane Doe, through counsel, and states the following to this Honorable Court as her Complaint for discrimination and retaliation in violation of Title IX of the Education Amendments of 1972 ("Title IX") against Manor College:

### INTRODUCTION

1.      When two Manor College students locked Plaintiff Jane Doe in a dorm room and began to sexually harass her, she was scared and started recording the harassment. The two Manor students then sexually assaulted Doe. Doe reported the sexual assault to Manor College, and instead of sanctioning the students who assaulted her, Manor sanctioned Doe for recording the students without their consent. From there, Manor College began to monitor Doe's every move and sanctioned her for a series of alleged student conduct violations, including small issues like playing her music too loudly in her dormitory. Within less than two months, Manor College sanctioned Doe with 14 different alleged Code of Conduct violations, evicted Doe from the dormitory, threatened her with expulsion, and twice threatened her with civil legal actions for her "prolific, harassing, and potentially slanderous or libelus [*sic*] communications," where her only

communications with administrators concerned her sexual assault complaint and her repeated requests for help because she feared for her safety on campus.

2.      Not only did Manor College relentlessly retaliate against Doe, it was also deliberately indifferent to Doe's complaint of sexual assault.  Manor conducted a sham hearing, where it required Doe to testify twice and each time her assailants were allowed to interrupt her testimony with threats and outbursts, such as yelling "liar!"  The committee improperly questioned Doe about her sexual history, refused to allow her to present witnesses, and barred her from playing the audio recording of her assault.  After the hearing, Doe sent pleas to Manor administrators asking for help because one assailant lived in her dormitory and another was in her Chemistry class, and she did not feel safe in the dorms or in her classes.  No administrator responded, and because Doe felt unsafe on campus, she stopped attending classes regularly and her emotional well-being declined.  Ultimately, when Manor sent Doe a letter evicting her from the dormitory, Doe felt so overwhelmed and under attack that she attempted suicide the next day, and soon thereafter, unenrolled from Manor College.

3.      Manor College's treatment of Jane Doe violated Title IX's prohibition against discrimination and retaliation.

### PARTIES

4.      Plaintiff Jane Doe[1] was an adult female student at Manor College from August 2016 through November 2016, who continues to reside in Pennsylvania.

5.      Defendant Manor College (formerly Manor Junior College) is a private institution of higher education, located at 700 Fox Chase Road, Jenkintown, Pennsylvania 19046.

---

[1]      With her Complaint, Plaintiff files a Motion to Proceed Under Pseudonyms.

6.     At all times relevant hereto, Manor College was a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the laws of the United States.  Specifically, Plaintiff asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq.*

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Manor College resides within this Court's judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

## FACTS GIVING RISE TO RELIEF

9.     Plaintiff Jane Doe began as a freshman at Manor College in August 2016.

10.     Doe enrolled at Manor in the school's honors program with a major in Pre-Medicine.  Manor awarded Doe a Founders Scholarship, which covered part of Doe's tuition for her first year.  Doe lived on campus and became a Residence Hall leader who helped plan student events and programs.

11.     On September 17, 2016, Doe was with a male Manor student ("Assailant 1"), who was a Resident Assistant ("RA") in her dormitory, another male Manor student ("Assailant 2"), and another male who was the cousin of Assailant 1, visiting for the weekend.  The male students began coercing Doe into taking off her clothes and having sex with them, and undressed themselves.  Doe tried to leave, but the male students blocked the door.  When she was unable to leave the room and feared for her safety, Doe was able to reach her cell phone and began to record the interaction.

12.     In the RA's dorm room, the male students sexually assaulted Doe.  Leading up to and during the assault, Doe was physically distraught, said "no" multiple times, and told them to stop.  During the assault, Doe lost consciousness.

13.     Upon information and belief, while Doe was unconscious and naked, one of the assailants took a picture of her.

14.     Doe's cell phone recorded part of the sexual assault.

15.     On or about September 19, 2016, Doe reported the sexual assault to an RA in her dormitory at Manor.  This RA thanked Doe for coming forward and told Doe that she would report the sexual assault to the Residence Coordinator for Manor College, Lynn Wales ("Wales").

16.     Doe learned from a Manor student that a picture of her, naked and unconscious, was circulating electronically among other Manor students.  She reported this behavior to the RA, as well.

17.     Upon information and belief, the RA did not report the sexual assault to the Dorm Coordinator, a Title IX coordinator, or any Manor College staff or faculty.

18.     When Doe did not hear from any Manor administrator regarding her report of sexual assault and the picture distribution, she next went to report to and speak directly with Lynn Wales.

19.     The next day, on or about September 20, 2016, Doe reported the sexual assault to Wales.  Wales told Doe that the RA never reported it, and expressed shock because the RA and Assailant 1 were in Wales's office the night before.  Doe told Wales that she was able to record part of the assault and Wales told Doe that she needed to report to Allison Mootz ("Mootz"), Director of Student Engagement for Manor College.

20.     In addition to Director of Student Engagement for Manor College, Mootz held the position of Hearing Officer for the Student Conduct Committee ("SCC"), the committee responsible for adjudicating claims of student conduct code violations, including sexual assaults. As the Hearing Officer, she had the authority to initiate the disciplinary process if she determined that "it would be in the College's best interest."  She was charged with reviewing all reported student conduct violations to "verify that the stated allegations are in violation of college policies." Mootz also served as the Chair of the Student Conduct Committee and was responsible for determining the admissibility of evidence during student conduct hearings.

21.     On or about September 20, 2016, Doe met with Mootz to report the assault and ask about how the school could help her move forward.

22.     Aside from encouraging Doe to report the sexual assault to the police, Mootz did not provide information on counseling services, medical treatment, or other available academic support or accommodations.

23.     During this meeting, Mootz directed Doe to provide a written statement detailing the sexual assault.  Doe reported that she believed the assailants distributed the photograph they took of her when she was unconscious during the assault and that her phone captured part of the assault.

24.     Mootz asked Doe to send her a copy of the recording.  Mootz told Doe that she could use the audio file as evidence in her SCC hearing and that she would be able to present witness statements.

25.     After the meeting, on September 21, 2016, Doe emailed Mootz the audio recording of the sexual assault.

26.     On September 23, 2016, Mootz emailed Doe to inform her that the SCC would hold a hearing on her claim of sexual assault on September 26, 2016.  Mootz said the SCC would also consider her claim that the assailants electronically distributed a lewd photo of her at that hearing. Mootz told Doe that if she planned to present witnesses at the hearing, she needed to provide their names and written statements within the next three days.

27.     Doe responded to Mootz to tell her that she was able to obtain witnesses' written statements, but that they may not be able to be physically present because of the short notice, class schedules, and other concerns.  At the time, Mootz told her she would be able to use written statements in the hearing.

28.     Manor's policy requires that an "Incident Worksheet" and "Incident Report" are created when a student is accused of a Code of Conduct violation.  The student has a right to review these documents.  Hearings are tape-recorded and kept on file in the Campus Security Department. Manor policy requires that the SCC report its decision in writing within three class days after the close of the hearing.  Sanctions, such as the issuance of monetary fines, are discretionary.

29.     On September 26, 2016, Manor's SCC held the hearings on Doe's claims.

30.     The SCC divided Doe's claims into two separate hearings, one for each assailant, back-to-back on the same day.  The SCC required Doe to testify twice, each time with the assailant sitting directly next to her in the hearing room.

31.     During Doe's testimony against Assailant 1, Assailant 1 interrupted her, standing up and yelling that she was a liar.  The SCC allowed him to continue to interrupt Doe throughout her testimony.

32.     During Doe's testimony against Assailant 2, Assailant 2 similarly interrupted her and yelled that she was not remembering something correctly.  The SCC ignored the outburst as an interruption and allowed Assailant 2 to interject in her testimony throughout the hearing.

33.     The SCC asked about Doe's prior sexual history.  Doe told the SCC that she had engaged in consensual sexual activity in the past.  Despite the irrelevant and inappropriate nature of the question, when Doe answered that she had engaged in consensual sexual activity in the past, Mootz said with a tone of surprise, "Oh, I didn't know that."

34.     Mootz's expression and statement suggested to Doe that Mootz found her past consensual sexual activity relevant—and negatively so—to her claim of sexual assault.

35.     Doe was only allowed in the hearing room when she was testifying and presenting her evidence.  Manor did not allow Doe in the room when the assailants were presenting their evidence.

36.     As a result of the structure and questioning, the hearing experience was very traumatic and intimidating for Doe.

37.     The SCC's failure to effectively stop the outbursts of Assailant 1 and Assailant 2, and conduct a hearing in an orderly manner, reflected deliberate indifference to the rights of Doe.

38.     On September 29, 2016, Doe received an email from Chrystyna Prokopovych, informing her of the outcome of the SCC hearing.  Prokopovych was Manor's Code of Conduct Chair.

39.     The email does not mention Doe's claims of sexual assault or lewd photo distribution.  The SCC instead sanctioned both Assailant 1 and Assailant 2 with a "Violation of Resident Hall Guest Policy," which requires that "resident students personally sign in his/her guest at the Residence Hall 24-hour Security Office Window" and "remain with their visitors at all times

while in the Residence Hall." For this violation, the SCC implemented a "Loss of Guest Privileges for 30 (thirty) days beginning Tuesday, September 27, 2016 and ending October 27, 2016."

40.    Shocked that the findings did not even mention the report of sexual assault and lewd photo distribution, Doe responded to Prokopovych's email and copied Mootz, stating her concern that her hearing was "an unfair trial." She said, "I reported a claim of sexual harassment[,] sexual coercion and unwanted advances. [I]t was unwanted and inappropriate touching and the sharing and taking of a naked photo of me unknowingly, along with lewd and sexually offensive words." Doe protested that the school failed to provide her academic support or accommodations and did not use the recording in the hearing on her sexual assault complaint. She said, "There have been no accommodations for me in the overall well being and adjustment of class that I take with [Assailant 2], and neither have there been any change of resident status for [Assailant 2] or [Assailant 1]."

41.    Doe did not feel safe with both assailants having access to the Resident Hall and with Assailant 2 enrolled in one of her classes.

42.    Mootz responded to Doe, and ignoring the bulk of her email, told her that she did "not articulate a basis upon which an appeal can be had," and directed Doe to email Manor's Dean of Students, who Mootz described was the last level of review for SCC decisions.

43.    In her September 30, 2016 email conversation with Mootz, Doe asked who she could speak with to access the video footage maintained by Manor in the dormitory so that she could review the footage recorded during the time she was assaulted. Doe believed it would have caught the assailants and her entering Assailant 1's dormitory, and would help corroborate her claims. She also asked who had authority to grant special permission to students to live in the

8

dormitory over the age allowed in Manor's policy. Doe asserted that Assailant 2 was 26 years old and Manor policy only allowed students up to the age of 24 to live in the dormitory.

44.     The video footage captured by Manor in the dormitory is contemporaneous evidence of who entered the dorm hallway around the time of the assault and may reveal witnesses or others who may have taken the photo at issue.

45.     Mootz did not respond to Doe's questions and ignored Doe's comments about Manor's lack of academic support or accommodations.

46.     On October 1, 2016, Doe emailed Manor Dean of Students Sister Marie Francis Walchonsky ("Dean Walchonsky"), who was responsible for administering sanctions for violations of the Code of Conduct and was the proper channel for SCC-related appeals. Doe repeated her concerns that the hearing was unfair. She said, "I had alleged Sexual Harassment and a lewd and explicit photo of me that was shared via electronically [*sic*], which were both violations of Manor's policy." She explained that she had an audio recording of part of the sexual assault, and that the SCC failed to consider this evidence. Additionally, she requested access to the Residence Hall security footage and permission to use that footage as new evidence to support her allegations.

47.     Dean Walchonsky did not respond to Doe's email requesting an appeal of the SCC findings.

48.     Three days later, on October 4, 2016, Doe received a letter from Dean Walchonsky sanctioning Doe for two alleged violations of Manor's Code of Conduct, including a violation for "[a]udio recording without permission" on the date of Doe's sexual assault. The letter also sanctioned Doe for "[f]ail[ing] to [a]ppear for Hearing Officer meeting." Manor sanctioned Doe with a $50 fine and ten hours of community services in the Ukrainian Heritage Studies Center.

49.    Unlike the letter issuing her male assailants a sanction (*see* ¶ 38), Doe's sanction letter did not include information about an opportunity to appeal.

50.    The letter stated that Doe broke Pennsylvania law when she recorded her sexual assault.  Manor administrators repeated the claim and told Doe that she was being sanctioned for the recording because it violated Pennsylvania law.

51.    Doe's recording of her sexual assault did not violate Pennsylvania law, which specifically allows for victims of crime to record individuals without their consent: "It shall not be unlawful . . . for . . . [a]ny victim [or] witness to intercept the contents of any wire, electronic or oral communication, if that person is under a reasonable suspicion that the intercepted party is committing, about to commit or has committed a crime of violence and there is reason to believe that evidence of the crime of violence may be obtained from the interception."  *See* 18 Pa.C.S. §§ 5702(1)(ii), 5704(17).

52.    Manor's sanction based on its deliberate misrepresentation to Doe that she had violated state law shows its animus toward Doe and her report of sexual assault, deliberate indifference to her rights under Title IX, and hostility toward her requests for a fair hearing, all of which constitute protected activity under Title IX.

53.    By its deliberate misrepresentation to Doe that her act of recording the assault violated Pennsylvania law, Manor intended to intimidate Doe and end pursuit of her claim.

54.    The day after receiving the sanction letter, Doe received a letter from Sheila Gillespie, Vice Chair of the Student Conduct Appeals Committee.  Gillespie was the Assistant to the Vice President of Academic Affairs for Manor and was responsible for granting or denying SCC-related appeals from the Student Conduct Committee.  Gillespie stated that "all proper

hearing procedures were followed, and there is no new admissible evidence for the case," and therefore Doe's request for an appeal was denied.

55.    In response to Doe's request for the dormitory hallway video footage recorded during the time of her assault, Gillespie stated that the footage was "college property, and it would be a violation of FERPA law to distribute this to another student."

56.    Doe asked Gillespie if there was any other way to appeal the SCC's findings because the SCC did not address her report of sexual assault or distribution of the lewd photo, only making a finding with respect to Manor's guest policy.  Doe repeated her ongoing, unaddressed safety concerns, stating, "I feel uncomfortable and not safe having to reside in the same class and resident hall living as my assailants."

57.    Gillespie ignored Doe's comment that she continued to feel unsafe at school. Gillespie responded, stating that her decision was final and "this case is considered closed."

58.    In October, when no Manor administrator responded to Doe's concern that she felt unsafe sitting in Chemistry class with Assailant 2, Doe spoke directly with her professor.  Doe asked if she could be moved to a different class and the professor refused.

59.    No Manor faculty or administrator ever addressed Doe's reports that she was scared and felt unsafe in school.

60.    As a result of Manor's deliberate indifference to Doe's ongoing safety concerns, Doe stopped regularly attending her classes and her emotional well-being deteriorated.

61.    On October 6, 2016, Doe emailed Dean Walchonsky to appeal the sanctions levied against her for recording her sexual assault without the consent of the assailants.  In her appeal request, Doe explained "the reason I had recorded those students was because I feared for my safety," knew the assailants would deny their actions, and the "hostile and gang up environment

sparked me to record." Doe cited Manor's policy against sexual harassment and lewd speech or behavior.

62.     Dean Walchonsky did not respond to Doe's email.

63.     Upon information and belief, Assailant 2 sexually assaulted another Manor student, who reported the sexual assault to Manor and identified Assailant 2 as her assailant.

64.     On October 7, 2016, Mootz emailed Doe and said that Doe's "request for an appeal regarding the September 17, 2016 incident" (Doe's sexual assault by two Manor students and her recording), was denied because of "institutional policy."  She said the appeal committee chair reviewed the recorded hearing proceedings, found no problems, and her decision was final.  Mootz similarly ignored Doe's report that she felt unsafe on campus.

65.     Mootz denied that Doe's alleged Code of Conduct violation was a result of her report of sexual assault; Mootz claimed that it was "a separate issue."  She ignored Doe's reasons for recording the assault, and said "you violated the law by illegally recording individuals without their permission."

66.     Sanctioning Doe for recording her assailants without their consent was the beginning of a series of disciplinary actions Manor took against Doe for alleged infractions.  In less than two months after her sexual assault, Manor sanctioned Doe for 14 different Student Code of Conduct violations, including five charges of disorderly conduct and two charges of disrespecting authority, all of which appeared to stem from her requests for a fair hearing and complete findings from her report of sexual assault and distribution of a lewd photo.

67.     For example, on or around September 22, 2016, Manor held its monthly group meeting for the female residents of the Resident Hall.  Wales, the Residence Coordinator for Manor College, facilitated these mandatory meetings.

68.    During the September 22 meeting, a Manor student announced to the group that other students were threatening Doe because she reported a sexual assault against Assailant 1 and 2 and these students believed the assailants.  Doe was shocked and upset by the confrontation in a large group and asked who was threatening her.  When the discussion continued, Wales directed Doe to leave the meeting and she did.

69.    The next day, September 23, 2016, Wales explained that she told Doe to leave the meeting because the discussion was causing a disruption and her name was at the root of it.  Wales claimed that she asked Doe to leave twice before she actually left, and Doe explained that she did not hear the other directions because she left as soon as she was asked.  When Doe later received a letter from Manor listing alleged infractions, the meeting was listed as a time when Doe violated Manor policy.

70.    Wales did not mention any actual or potential consequences resulting from the September 22 dorm meeting.  She did not tell Doe she was receiving a verbal warning for her conduct or provide any other information to suggest that Doe did anything wrong in the meeting.

71.    On October 25, 2016, Doe was listening to music in her dorm room.  Two RAs knocked on Doe's door and told her a student complained about the volume of her music.  One of the RAs, a friend of Assailant 1, told Doe that she needed to tone her voice down because it was annoying.  The RAs told Doe they were going to report her for playing her music too loud.

72.    Two witnesses reported that the students who resided in the dorm next to Doe's were playing music louder than Doe's, or that they were near Doe's dorm room and did not hear her music.

73.    In September, 2016, Doe informed Wales and the first RA to whom she reported her sexual assault that she was worried about living in the dormitory with the RAs, including the

one who knocked on Doe's door, because they were friends with Assailant 1 and they expressed hostility toward her after she reported the assault.  Doe repeated this ongoing concern and hostility to Mootz at the end of September.

74.    Manor sought to sanction Doe for the complaint that she was playing her music too loud and held a SCC hearing. The SCC conducted the hearing to punish Doe for playing her music too loudly differently from the hearing for her sexual assault.  For example, although the school denied Doe's request to use Residence Hall footage as evidence supporting her sexual assault complaint, the school used hallway footage against her to show the RAs knocking on Doe's door to tell her there was a complaint that her music was too loud.

75.    At the hearing regarding her sexual assault, Mootz had prohibited Doe from presenting supporting witnesses who could only provide a written statement and not physically appear in the hearing.  Yet, at the hearing regarding the alleged loud music violation, Mootz permitted witnesses supporting Manor's charge against Doe to submit statements even though they were unavailable at the hearing.

76.    Upon information and belief, the same Manor officials conducted Doe's disciplinary hearings and Assailant 1 and Assailant 2's disciplinary hearings in response to Doe's report of assault.

77.    In late October, 2016, the SCC found that Doe violated the student conduct policies by playing her music too loud.  Manor sanctioned Doe with a $150 fine and ordered Doe to attend a counseling appointment.

78.    Also in October 2016, Manor sanctioned Doe for "Disrespect for Authority" and "Disorderly Conduct."  When Doe asked Mootz for an explanation of these sanctions, Mootz told her that her disorderly conduct was Doe "asking the same questions over again" related to her

sexual assault.  When Doe explained that she was asking because she kept experiencing unfair treatment, Mootz told her that Assailant 1 was no longer an RA in the dormitory (though he continued to live in the RA suite in the same dormitory as Doe) and said that his removal from the RA position should be enough to satisfy her.

79.    In early November, Doe was again accused of violating the Manor Code of Conduct.  This time, Mootz accused her of violating the guest policy and again told Doe that she used video footage to determine that a guest that Doe did not sign in entered her dormitory.  Doe provided Mootz with a witness statement from the Manor student who brought her guest by Doe's room so that they could meet, but Mootz ignored the evidence and without conducting a hearing, found that Doe violated the guest policy.

80.    On November 11, 2018, Doe emailed Prokopovych to explain that she was again unfairly sanctioned for conduct and subject to an unfair process.  She explained the differences between her sexual assault hearing, the rules that appeared to apply only to her, and how Mootz conducted the hearings against her differently.

81.    In this email, Doe again explained that she felt unsafe on campus.  She repeated her report that Assailant 1's friends were threatening her health and safety as retaliation for reporting the sexual assault.  Feeling frustrated and desperate, Doe told Prokopovych that she intended to contact the President of Manor College, and to seek outside review of Manor College's treatment of her.  Doe wrote, "I will be reaching out to other outside sources as well, to review the things that I am being wrongfully sanctioned for, but please respond and we will be in touch."

82.    Doe's intention to seek review of Manor College's treatment of her was an unwelcome challenge to Manor's direction to Doe to keep conversations about the sexual assault case quiet, and to only speak with Mootz or Gillepsie about concerns she had.

15

83.    On November 11, 2016, Doe emailed Manor President Jonathan Peri.  Doe said that she was considering a "potential civil lawsuit" against the school because of its "wrongful actions and lack of policy procedures" in how it had treated her.  Peri responded, directing Doe to have her attorney contact him.  Peri copied Mootz on the email.

84.    On Monday, November 14, 2018, Prokopovych wrote a two sentence response to Doe's email, stating "[t]he decision of the Student Conduct Committee has been approved by the Dean of Students and is final," and provided the link to the Student Code of Conduct section of the student handbook.  She—like the administrators before her—ignored Doe's complaints of ongoing harassment and discrimination.

85.    The next day, on November 15, 2018, Mootz wrote Doe to say that Manor had labeled her a "Student of Concern."

86.    According to the Manor College Student of Concern Referral Form, a "Student of Concern" is someone "displaying signs of intense emotional distress, inappropriate or disruptive behavior, or potentially dangerous behavior."  When a Student of Concern is identified, the Student of Concern Team "respond[s] as quickly as possible to students in distress and offer[s] support and resources."

87.    Mootz told Doe that several faculty members and teachers had expressed concerns about Doe.  Mootz said she was available to speak with Doe, but otherwise did not offer any counseling services, accommodations, or information to help Doe.  Mootz did not address Doe's multiple outstanding reports that she felt unsafe on campus.

88.    Three days later, on November 18, 2016, Dean Walchonsky sent Doe a letter listing eleven alleged disciplinary actions taken against Doe from September 17, 2016 (the day of her assault) through November 11, 2016.  The letter charges Doe with discussing her concerns about

the Code of Conduct with "individuals in and across the community instead of following institutional policies and procedures." The letter evicted Doe from her dorm room, giving her approximately 24 hours to pack her belongings and leave campus.

89.    In the November 18 letter, Dean Walchonsky threatened Doe:

[I]f there are further code of conduct violations caused by you on Manor's campus, then we will fully expect to expel you from our institution. Because of your prolific, harassing and potentially slanderous or libelus [*sic*] communications across our institution, you are also to no longer to have contact with individuals in our institution that do not fall into the appropriate categories of policy or pressing need for business with or within the institution, and the specific department. If your inappropriate behaviors as such persist, we will take all appropriate civil actions against you.

90.    The only contact Doe had with administrators or faculty at Manor were her requests for accommodations, her reports that she felt unsafe on campus, and her questions about possible appeals when she experienced an unfair and biased process.

91.    Manor kicked Doe out of her dormitory a week after she reported her concerns that she was experiencing retaliation and mentioned seeking help from someone outside Manor to review Manor's conduct.

92.    Three days after Manor acknowledged that Doe was experiencing emotional distress, Manor kicked her out of the dormitory and told her she needed to be off campus within 24 hours.

93.    Manor's unyielding and inescapable retaliation severely affected Doe's emotional well-being. Her feelings of desperation and helplessness worsened when she received Dean Walchonsky's November 18 letter kicking her out of Manor's dormitory.

94.    On November 19, 2018, Doe attempted suicide and was rushed to the hospital.

95.    After Doe's suicide attempt, she was hospitalized for a period of time and through the advice of her doctor, realized she was not emotionally well enough to return to Manor and cope with its retaliation.

96.    As a result of Manor's deliberate indifference and disregard of Doe's report of sexual assault, and its unrelenting retaliation, Doe unenrolled from Manor in late November 2016.

97.    On December 31, 2016, Doe emailed Manor President Jonathan Peri.  Doe had received a telephone call from the registrar's office informing her of a financial hold on her account due to the $150 fine that was issued.  Doe asked Peri if her $200 deposit for her dormitory—a deposit she was entitled to receive back at the end of the semester—could be used to cover the cost of the fine.  President Peri refused to discuss Doe's inquiry.

98.    Instead, Peri emailed Doe, telling her Manor "will not reply further" to her correspondence and would only communicate through Doe's attorney; however, Peri said, if Doe did not have an attorney "and agree[d] to withdraw any and all claims and potential claims against the college, and any and all of its personnel, then maybe we can correspond.  However, even if you agree to those things we will need to have it in writing and prepared in the form of a release and signed by you."

99.    Peri then explicitly threatened Doe, "You are to cease-and-desist from any and all further communications with anyone at the college. If you persist with communications with anyone at the college, then we will seek all available civil remedies against you."

100.    As a result of Manor's continued threats, Doe did not further inquire about receiving her $200 deposit nor could she contact any Manor officials regarding records related to her education.

**COUNT ONE**
Sex Discrimination in violation of Title IX
20 U.S.C. § 1681 *et seq.*

101.    Plaintiff Jane Doe incorporates by reference paragraphs 1 through 100, as if set out here in full.

102.    Doe, a student at Manor College, was sexually assaulted by two Manor College students.

103.    Doe's sexual assault was severe, pervasive, objectively offensive, and created a hostile educational environment for Doe based on her sex.

104.    The electronic distribution of a lewd photograph of Doe among Manor students was severe, pervasive, objectively offensive, and created a hostile educational environment for Doe based on her sex.

105.    Doe reported the sexual assault and distribution of a lewd photograph to multiple Manor College administrators and employees who had the authority and ability to investigate and take corrective action to address each act.

106.    Multiple Manor College administrators and employees had actual knowledge of Doe's report of sexual assault and the distribution of a lewd photograph.

107.    At all times relevant hereto, Manor College received federal financial assistance and was obligated to address Doe's sexual assault report because student-on-student sexual assault is a form of sex discrimination under Title IX.

108.    By its acts and omissions, Manor College was deliberately indifferent to Doe's sexual assault and created a hostile educational environment for her.    Manor's deliberate indifference included, without limitation:

      a.    Failing to conduct a fair hearing on her claim of sexual assault;

b.  Allowing Doe's assailants to interrupt, intimidate, and harass her during the hearing on her sexual assault claims;

c.  Prohibiting Doe from presenting evidence and witnesses during the hearing on her sexual assault claims;

d.  Never issuing the findings of the hearing into Doe's complaint of sexual assault and distribution of a lewd photograph, taken without her consent;

e.  Prohibiting Doe from using hallway recordings as evidence in support of her sexual harassment claims, yet using such recordings as evidence against her in support of Manor's retaliatory disciplinary hearing against her;

f.  Dismissing Doe's requests for additional information and appeals regarding the results of Manor's hearing on her sexual assault claims;

g.  Failing to respond to Doe's multiple reports that she did not feel safe on campus because of the continuing presence of her assailants and their hostility directed toward her;

h.  Failing to offer or discuss reasonable accommodations or academic support to aid Doe after the sexual assault;

i.  Forcing Doe to live in the same dormitory as Assailant 1 and attend class with Assailant 2;

j.  Failing to create, implement, distribute, and enforce sexual harassment policies and procedures in compliance with Title IX;

k.  Threatening Doe that her lawful recording of the sexual assault violated Pennsylvania law, "you broke the law when you illegally recorded individuals

20

without their permission.  We did not report this to police, but you were found guilty via the Code of Conduct Committee."

l.  Threatening Doe that Manor would pursue civil legal action against her if she continued to press her claims.

m.  Intimidating Doe from further pursuing her legal rights; and

n.  Evicting Doe from Manor's dormitory and issuing other unjustified and unfounded disciplinary actions.

109.  Manor's actions and inactions caused Doe to undergo harassment by Manor students and made her liable or vulnerable to it.

110.  Doe experienced further harassment by Manor students because Manor College failed to act effectively on her report of sexual assault and her repeated pleas for assistance because she continued to feel unsafe on campus.

111.  Manor's deliberate indifference to Doe's sexual assault deprived her of access to educational opportunities and benefits provided by Manor.

112.  As a direct and proximate result of Manor's violation of Doe's rights under Title IX, Doe has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, loss of enjoyment of life, fear, anxiety and trauma; lost future earnings and earning capacity; and expenses for past and future medical and psychological care.

**COUNT TWO**
Retaliation in violation of Title IX
20  U.S.C. § 1681 *et seq.*

113.  Plaintiff Jane Doe incorporates by reference paragraphs 1 through 100, as if set out here in full.

114.    At all times relevant hereto, Manor College received federal financial assistance and was subject to Title IX.

115.    Doe engaged in activity protected under Title IX when she reported that she was sexually assaulted by two Manor College students and that a lewd photo of her naked and unconscious had been distributed electronically among Manor students

116.    Doe engaged in activity protected under Title IX when she asked Manor to reconsider its findings with respect to her claim of sexual assault and distribution of the photo.

117.    Doe engaged in activity protected under Title IX when she questioned the adequacy and fairness of Manor College's process and repeatedly asked for help because she did not feel safe on campus.

118.    Doe engaged in activity protected under Title IX when she repeatedly asked Manor for academic support and accommodations.

119.    Doe engaged in activity protected under Title IX when she told Manor that she intended to seek outside review of Manor's treatment of her.

120.    Manor College knew about Doe's protected activity, the names of her assailants, and the details of her sexual assault because Doe reported the sexual assault to Manor personnel and asked the school to take prompt and adequate action to investigate the assault and sanction her respective assailants' conduct.

121.    By its acts and omissions, Manor College retaliated against Doe because she engaged in activity protected under Title IX.  Manor's retaliation included, without limitation:

        a.    Sanctioning her for recording her assailants sexually assaulting her without first seeking their consent;

b.  Claiming that Doe's recording of her assailants without their consent violated Pennsylvania law, which was not true;

c.  Prohibiting Doe from presenting witness statements in support of her sexual harassment complaint, yet allowing Manor to use witness statements against her when seeking to discipline her after she engaged in legally protected activity;

d.  Prohibiting Doe from using hallway recordings as evidence in support of her sexual assault claims, yet using such recordings as evidence against her in support of Manor's retaliatory disciplinary hearing against her;

e.  Applying heightened standards and requirements to Doe in disciplinary proceedings against her, as compared to disciplinary actions against her male assailants;

f.  Sanctioning Doe for alleged conduct without a full and fair hearing;

g.  Relentlessly and persistently seeking to discipline Doe for acts or omissions that are typically not of significant concern to Manor College;

h.  Threatening Doe that her lawful recording of the sexual assault violated Pennsylvania law, "you broke the law when you illegally recorded individuals without their permission.  We did not report this to police, but you were found guilty via the Code of Conduct Committee;"

i.  Evicting Doe her from her dormitory;

j.  Refusing to speak with her about a financial hold and fine issued against her unless she first provided a signed release of "any and all claims and potential claims against the college, and any and all of its personnel"; and

23

k.   Threatening Doe with civil legal action;

122.   Each of Doe's alleged Code of Conduct violations followed within one to seven days of her protected activity.

123.   Manor College's retaliation deprived Doe of access to educational opportunities and benefits provided by Manor College.

124.   As a direct and proximate result of Manor's violation of Doe's rights under Title IX, Doe has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, loss of enjoyment of life, fear, anxiety and trauma; lost future earnings and earning capacity; and expenses for past and future medical and psychological care.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1.   Enter judgment in favor of Plaintiff Jane Doe on her claims for discrimination and retaliation under Title IX;

2.   Enter judgment against Manor College;

3.   Declare Defendant Manor College's conduct and treatment of Jane Doe in violation of Title IX of the Education Amendments of 1972;

4.   Award Plaintiff compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiff's expenses incurred as a consequence of the sexual assault and Manor College's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by Manor College; and damages for past, present and future emotional pain

24

and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

5.    Award retrospective injunctive relief to be determined at trial requiring Manor College to remedy its violations of Title IX;

6.    Award Plaintiff pre-judgment and post-judgment interest;

7.    Award Plaintiff her court costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b); and

8.    Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Jane Doe demands a trial by jury on all issues contained herein.

Date: December 10, 2018          Respectfully submitted,

POLLINS LAW FIRM

_/s/ Scott Pollins_____
Scott M. Pollins - Pa. Atty. Id. No. 76334
800 Westdale Avenue
Swarthmore, PA 19081-2311
(610) 896-9909 (tel)
(610) 896-9910 (fax)
scott@pollinslaw.com

CORREIA & PUTH, PLLC

_/s/ Linda M. Correia_____
Linda M. Correia (PHV application forthcoming)
Lauren A. Khouri (PHV application forthcoming)
1400 16th Street NW, Suite 450
Washington, D.C. 20036
(202) 602-6500 (tel)
(202) 602-6501 (fax)
lcorreia@correiaputh.com
lkhouri@correiaputh.com

*Counsel for Jane Doe*

25